### THE ARIEL.

Petition of BOAT ARIEL, Inc.

BOAT ARIEL, Inc., v. JACOBSEN et al.

No. 192.

Circuit Court of Appeals, Second Circuit.

May 19, 1941.

Haight, Griffin, Deming & Gardner, of New York City (Arthur O. Louis and James M. Estabrook, both of New York City, of counsel), for claimants-appellants.

Mahar & Mason, of New York City (Frank C. Mason and Edward L. P. O'Connor, both of New York City, of counsel), for petitioner-appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The petitioner, as owner of the Fishing Vessel Ariel, brought the present proceeding to obtain exemption from or limitation of liability for damages growing out of the loss of the Ariel on or about September 21, 1938, when the great hurricane occurred which destroyed so many vessels along the Atlantic seaboard. Personal representatives of members of the crew who lost their lives on that occasion filed claims in the limitation proceeding which were disallowed by the District Court after trial.

The claimants appeal on the ground that (1) the proceeding did not lie because it was not instituted within six months after a written notice of claim had been given pursuant to Title 46 § 185 of the U.S.Code, 46 U.S.C.A. § 185, (2) on the ground that in any event the claims were good on the merits because they arose on account of the unseaworthiness of the Ariel. It is unnecessary to consider whether the notice was insufficient and, therefore, the six months statute did not apply since we hold that the claimants did not establish any right of action on the merits.

The Ariel sailed from New York on September 13, 1938, to fish for scallops. She was last seen late in the afternoon of September 21, but never returned to port and no survivor of her crew of nine of whom the claimants are the personal representatives has ever been found.

The petitioner contends that the loss of the Ariel and the deaths of her crew were due to the unprecedented storm. The claimants, on the other hand, argue that the Ariel was lost because she was an unseaworthy vessel. Unseaworthiness was said to be due (1) to the insufficient means whereby her pilot-house was fastened to

the engine trunk, (2) the installation of a door in the bulkhead between the fishhold and the engine-room, (3) the presence of a grating over the hatch leading from the pilot-house to the engine-room.

To show the cause of the loss of ship and crew the petitioner introduced the deposition of George Olsen, an apparently disinterested witness, who testified that he passed close to the Ariel near the Nantucket Lightship at 4:40 or 5:20 P. M. on September 21, 1938, and that she gave no signs of distress. She was then drifting at a point above the whistling buoy to the north of the lightship and only about a mile from it. Excerpts from the log of the light ship were received in evidence under the appellant's objection. But the objection to the excerpts was on the ground that an opportunity for cross examination had not been given as to the record of the entries and that the record did not disclose where the Ariel was when the various wind forces were reached. Proof was however supplied by Olsen as to where she was when he saw her late in the afternoon.

■ The statute which permits the admission of copies of records, Title 28 U. S.C.A. § 661, would cover the admission of the extracts since the objection was not made that the entire log was not offered. The abstract was as follows:

■ The comments of the master which were admitted as excerpts from the log were that the Ariel was not sighted on September 21, 1938, by the master of the lightship and that all vessels gave the lightship a good berth because of the severity of the storm so that he could not obtain their names. He also added that there were four fishing vessels hove to within a radius of six miles but none gave any evidence of being in distress or in need of help. These comments are not shown to have been a part of the log. They apparently were not contemporaneous entries relating to matters concerning the lightship but were subsequent memoranda. It may be that they should not have been admitted as copies of any part of the ship's log. But we cannot see that they were prejudicial to the claimants' case. On the other hand, the excerpts we have quoted above were rightly received as copies of official documents. See Wigmore on Evidence, 3 Ed. § 1641 (2). Nothing was required to render them admissible except proper certification which seems to have been given. If the objection had been made that a copy of the entire log was not produced it would not have been a good one for there is no reason to suppose that anything relevant was omitted and the claimants could have obtained the entire

| "Weather | Wind | Force | Sea | Barometer | Temperature | Time |
|----------|------|-------|-----|-----------|-------------|------|
| B. | SSE | 4 | Mod. | 29.98 | 69 | 4:00 A. M. |
| B.C. | South | 6 | Rough | 29.92 | 70 | 8:00 A. M. |
| B.C. | SSE | 10 | Heavy | 29.74 | 76 | 12:00 Noon |
| O.C.P. | South | 11 | Heavy | 29.58 | 72 | 4:00 P. M. |
| B.C. | SSW | 9 | Heavy | 29.80 | 66 | 8:00 P. M. |
| B. | SW | 7 | Heavy | 29.95 | 64 | 10:00 P. M. |

"4:00 A. M. Day opens clear with moderate sea.

"3:35 P. M. Started Diaphone

"5:45 P. M. Stopped Diaphone.

"6:00 P. M. Dory crushed in by heavy sea, secured dory best we could until sea moderates.

"10:00 P. M. Day ends with partly cloudy sky, heavy sea, ship laboring heavily.

"(d) The following is a list of officers on duty aboard this vessel during September 21st, 1938. Guy V. Emro, Master. George Harrison, Mate. Charles A. Colson, Assist. Engineer. A. W. Lindquist, Senior Radio Operator. Walter Milligan, Radio Operator."

document by subpœna duces tecum if they had desired and put it in evidence.

■ The daily record of the U. S. Weather Bureau at Providence, R. I., indicated a hurricane blowing from the southwest at 65 miles at from 4 to 5 o'clock in the afternoon with a maximum velocity of 87 miles at 4:05 P. M., with a velocity of 95 miles at 4:07 and a velocity of 47 miles between 5 and 6 o'clock. It stated that no more maximum velocities were available after the anemometer was blown away at 4:53 P. M., when the rate was 51 miles. The U. S. Weather Bureau at Nantucket reported a velocity of 42 to 47 miles between 4 and 5 P. M., and 38 to 43 miles between 5 and 6 P. M. The Weather

Bureau at Block Island indicated a velocity of 73 to 82 miles between 3 and 4 P. M., and 54 to 60 miles between 5 and 6 P. M. The proof showed that winds of great force and rough seas were prevailing and that the Ariel, when last seen, was drifting in a gale blowing toward the Nantucket Shoals and a tide running in the same direction. Parts of her wreckage were afterwards found close by the Shoals. Her destruction and the drowning of her crew through perils of the sea were inferences which the court below, properly if not inevitably drew.

The claimants' contention, however, is that the Ariel was unseaworthy and that unseaworthiness and not the storm, which certain fishing boats in the Nantucket region apparently survived, was the cause of her destruction. But the District Judge found that she was not unseaworthy and there was sufficient evidence to sustain such a finding.

The alleged unseaworthiness based upon insufficient fastening of the pilot-house was disproved by the testimony of Greene and Moore. Greene worked upon the Ariel at his shipyard in Bridgeport in June, 1938, and testified that he placed five extra bolts in the pilot-house to strengthen the existing fastenings. They went down from the top of the pilot-house to the sister beam and the knee in the main deck on the engine-house trunk. Other witnesses testified that the pilot-house was leaking at the edges where it was seated in the engine-house trunk and that the existing bolts which had fastened the pilot-house to the engine-house trunk were stripped. But Greene said that he found no indication of any wrenching or starting of these bolts. These other witnesses were relatives of members of the drowned crew. The District Judge might well have regarded their testimony as to the stripping of the original bolts as exaggerated. If it amounted to anything, the strengthening of the fastenings by Greene

was enough to remedy defects. The claimants attempt to break down Greene's testimony as to the five bolts by his admission that he could not have installed one of the bolts in the rear of the pilot-house if there had been a door in the rear and by producing photographs, Exh. O, P and N showing a door and window instead of two windows about the year 1931. But two of the three extra rear bolts might have been installed even if there had been a door and there was no photographic proof that the pilot-house did not have two windows at the time when Greene made the repairs even if it had not had two windows some time before. This again was a question of fact dependent upon which set of conflicting evidence to believe, and the trial judge believed the testimony of Greene which Moore confirmed. The latter said that there were two windows, and not a door and a window at the time Greene made the repairs.

There was proof that the hatch had a steel cover, and so the trial judge found, though Greene had the somewhat vague impression that the cover was of wood. There was sufficient proof that the hatch cover was not a mere grating that would let in water and it can make little difference whether the outside cover was of wood or steel.

In respect to the door from the engine-room into the fish hold, Moore said that such a door would have been dangerous to the crew, though not to the ship. It seems extraordinary to suppose that such a door might have caused the sinking of the vessel when, upon the assumption of each side, the pilot-house must first have been shattered or washed off by the storm. In such an event the seas would have entered the engine-room and the vessel beyond a peradventure would have foundered.

Decree affirmed.